UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| PETER DAN FISTER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 1:04CV00145ERW |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

MEMORANDUM AND ORDER

This matter comes before the Court upon *pro se* Petitioner, Peter Dan Fister's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a person in Federal Custody, filed October 27, 2004, which was supplemented by Mr. Fister on December 13, 2004. The Government filed its response on December 24, 2004, requesting this Court deny Mr. Fister's motion without an Evidentiary Hearing. On March 25, 2005, Mr. Fister filed an Amended Petition to Vacate or Correct Sentence [doc. #11]. The Government filed its supplemental response on April 28, 2005, and Mr. Fister replied with a Traverse on May 16, 2005. This Court issued its Memorandum and Order on December 8, 2005, granting, in part, and denying, in part, Mr. Fister's Amended Motion. The Court ordered an Evidentiary Hearing on the issue of Mr. Fister's counsels' conflicts of interest raised in Ground One. All other claims under Ground One and all claims under Grounds Two, Three, Four and Five were dismissed with prejudice. No certificate of appealability as to any dismissed claim was allowed. On February 13, 2006, Matthew E. Hill was appointed to represent Mr. Fister at the Evidentiary Hearing. An Evidentiary Hearing was conducted on April 25, 2006. The Government filed its post-trial brief June 15, 2006. Mr. Fister filed his post-trial brief August 2, 2006.

# *FINDINGS OF FACT*

Background facts of the December 8, 2005 Memorandum and Order are incorporated here by this reference. The Court will make specific findings regarding the testimony of certain witnesses who testified at the April 25, 2006 hearing.

Jasper Edmundson represented Mr. Fister when Mr. Fister entered his plea of guilty to Count II and Count III of the Indictment in cause no. 1:03CR00030 ERW. In exchange for those pleas, the Government agreed to Dismiss Count I at the time of sentencing.

Count I charged:

> On or about February 11, 2003, in Butler County, Missouri, in the Eastern District of Missouri, the defendant, PETER DANIEL FISTER, knowingly and intentionally distributed a substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841 (a)(1) and punishable under Title 21, United States Code, Section 841(b)(1)(C).

Count II of the Indictment charged:

> On or about February 12, 2003, in Butler County, Missouri, in the Eastern District of Missouri, the defendant, PETER DANIEL FISTER, knowingly and intentionally distributed a substance containing a detectable amount of methamphetamine , a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841 (a)(1) and punishable under Title 21 United States Code, Section 841(b)(1)(C).

Count III of the Indictment charged:

> On or about February 12, 2003, in Butler County, in the Eastern District of Missouri, the defendant, PETER DANIEL FISTER, knowingly and intentionally possessed a listed chemical, pseudoephedrine, knowing that the listed chemical would be used to manufacture methamphetamine, a Schedule II controlled substance, in a manner other than as authorized by Title 21, United States Code, Sections 801 through 971, in violation of Title 21, United States Code, Section 841(c)(2) and punishable under Title 21, United States Code, Section 841(c).

When Mr. Fister entered pleas of guilty to Counts II and III on July 28, 2003, the Court invited the Assistant United States Attorney to state or read into the record, facts she believed she could prove if called upon to present evidence at a trial of Mr. Fister's case. She recited as follows:

> MS. CRITES-LEONI: Your Honor, in the event there were a trial in this matter, the government would present evidence proving beyond a reasonable doubt that Mr. Fister did distribute methamphetamine on February 12th, 2003 and that he also possessed pseudoephedrine pills knowing they would be used to manufacture methamphetamine on the same date.
> The evidence that would be presented would show that on February 12th, 2003 Mr. Fister did meet with a confidential informant to make arrangements to exchange pseudoephedrine pills for methamphetamine. Fister gave the CI a free sample of methamphetamine, which consisted of .64 grams of pure methamphetamine. And this took place at a hotel in Poplar Bluff, Missouri, which is located in Butler County. The previous day, which would have been February 11th, 2003, the CI told Fister that he would have as many as 5,000 pseudoephedrine pills available. Fister wanted to know how many milligrams were in each pill, and the CI stated the pills contained 60 milligrams of pseudoephedrine in each pill. Fister then asked the CI if the CI wanted to smoke off the dope or if the defendant should. The CI responded the manufacturing process makes him sick, so Mr. Fister should manufacture the pills. Fister stated his dope is lithium dope and that he had a good spot to cook. Mr. Fister further stated, I'll do the whole thing for you, everything I get, I'll split with you. Mr. Fister added that he uses one lithium battery for every 60 pills he grinds up.
> Finally, Mr. Fister estimated that 5,000 24 milligram strength pills would yield at least five ounces of finished methamphetamine. Additionally, Mr. Fister informed the CI that they should not physically meet for the delivery of the pseudoephedrine pills. Mr. Fister wanted to pick up the pills at a remote location. Once that location was selected, the CI was to leave the pills at that location, Fister would pick up the pills and anticipated the methamphetamine would be ready the next day.

(Plea Tr. p. 12, l. 20 - p. 14, l. 6)

Mr. Fister, when asked if he had any disagreement with Ms. Crites-Leone's recitation, responded:

THE DEFENDANT: Yes I do your honor.

THE COURT: All right.

THE DEFENDANT: There's a few of them.

THE COURT: Go ahead.

THE DEFENDANT: The first one that I recall was that the pills were not in a Tide box, they were behind an electrical outlet. The second was that in the taped conversation or the conversation I initially had, the confidential informant asked me if I would manufacture the methamphetamine because it made him sick to do so. He stated that right off the top, not the other way around.

THE COURT: All right.

THE DEFENDANT: Then he further said what are you going to get out of this, five ounces? And I had said at least. I didn't say I was going to get five ounces, he said you will get that based on his experience of cooking methamphetamine. I felt like that might be a little bit important there because it wasn't quite accurate.

THE COURT: All right.

THE DEFENDANT: Other than that, the facts are pretty close.

(Plea Tr. p. 15, l. 18 - p. 16, l. 15).

Mr. Edmundson is a very experienced trial lawyer who has conducted numerous trials and made many appearances before this Court. It is apparent from examining all of the filed documents, listening to the testimony and judging credibility, that Mr. Edmundson expended substantial effort and time in representing Mr. Fister with a clear understanding of the weaknesses of Mr. Fister's case and the need to make strategic decisions to avoid a sentence for Mr. Fister in the range of 30 years imprisonment. In a letter to Mr. Edmundson from Ms. Crites-Leoni dated July 24, 2003, she states, "[i]n that event, the government would present evidence supporting a base offense level of 36, three level enhancement for role in the offense, two levels for using a

4

minor, and no points for acceptance. This would result in a final offense level of 41 and nearly a thirty year sentence." Ms. Crites-Leoni's letter begins with these words, "[t]he intent of this letter is to respond to your request for the government to agree that there should not be an enhancement for 'role in the offense' pursuant to U.S.S.G. § 3B1.1(c)." She advised that she cannot make further concessions to Mr. Edmundson. In a letter to Mr. Fister's mother dated August 26, 2003, Mr. Edmundson discusses strategy, including "sentencing manipulation and entrapment, however, those arguments would be directed towards a thirty year sentence instead of a fourteen or fifteen year sentence that we now face."

At the sentencing hearing on October 27, 2003, Mr. Fister was asked , after the Court announced that the sentencing guideline range was 168 to 210 months, "[a]t this time, Mr. Fister, do you, sir, have any lawful cause or reason to assign to the Court as to why the judgment of the Court should not now be pronounced upon you, sir? Mr. Fister responded, "[n]o, sir, your honor." In letters to Mr. Edmundson, Mr. Fister asked Mr. Edmundson to inform the Court at sentencing as to the character of Mr. Fister. Mr. Edmundson spoke at the sentencing on behalf of Mr. Fister as follows:

> THE COURT: Mr. Edmundson, it's your turn, sir.
>
> MR. EDMUNDSON: Judge, I would abbreviate my comments, particularly in view of Ms. Crites-Leoni's recommendation. I would say to the Court that this is somewhat onerous for me as well as Mr. Fister. I have known this family, Your Honor, for 60-plus years. I have known Mr. Fister since his birth. Mr. Fister is the oldest son. His mother is here in the courtroom today, Your Honor. He comes from a family that has distinguished itself through the years. He has a younger brother who did get in trouble due to drugs, and I believe that that is the primary reason Mr. Fister is before you today, regretfully. He has a sister who is a former Miss Missouri of this state. He has a sister who is a certified public accountant. He has a brother who is a professional golfer and a long ball hitting champion. I realize that's not very important to the Court, but in the world, just hitting a golf ball as far as it will go.
> Mr. Fister's family, Judge, has been very, very positive through the years. Danny, unfortunately, for one reason or another, Your Honor, became addicted to

methamphetamine a few years ago, and possibly some other drugs, to be quite candid with the Court. Up to that time, he was doing very well.

Although I didn't object to anything, I didn't feel that any of my comments could rise to an objection, there are things in the Presentence Report that I would like to clarify to the Court. For example, there is a comment made about his employment at Lockheed Martin. He actually worked for Lockheed Missiles and Space Company, which is a division of Lockheed Martin. His employee number was 671787. He has a vested retirement plan with that company, and he was furnishing accurate information to the investigating officer.

Additionally, there is a reference to his having attended college at Three Rivers in Poplar Bluff, which he did, and dropped out, Your Honor, primarily due to a family illness. He had a stepfather who was dying of an inoperable brain tumor. Following that, he did go to Arkansas State in Jonesboro. He attended there for three semesters. His mother reminded me this morning, Your Honor, that he was on the Dean's List for all three of those semesters, a 3.75 grade point average while he was at Arkansas State, so I would add my concurrence in what I think was the central theme of the letters that were sent to the Court prior to coming before you today, and that I believe that Peter Dan Fister is a valuable person, Your Honor, and I believe that he will once again at some point in time regain his rightful place in society and hopefully in our community.

He does have a family. He has two daughters that love him very, very much, and you know, it's just terribly, terribly sad that he could find himself in this situation. It's unfathomable to me, but I see people in this situation more often than I would like to, and it's simply due to a weakness, or an affliction, or whatever it might be, to become involved with some of these drugs.

I think my client is remorseful. If he hasn't already rehabilitated himself, Judge, I believe that he will.

I have some additional things. I hope the Court will consider housing him as close to his family as possible in connection with this matter, and due to his past involvement with drugs, Your Honor, I respectfully urge that the Court consider recommending him for the 500-hour intensive drug treatment program. I would certainly want Danny to benefit from that program to make sure that he never ever succumbs to this type of temptation again.

(Sentencing Tr. p. 7, l. 4 - p. 9, l. 17).

The Court then addressed Mr. Fister:

THE COURT: Mr. Fister, you are not required to say anything, but this is your opportunity if you care to make a statement, sir.

THE DEFENDANT: Yes, Your Honor. I would like to say that I'm really thoroughly ashamed that I would succumb to the temptation that was set before me, and my life actually dwindled down to bring me to this point. Sometimes I can't believe it's happening, but I can see the trail that it has left, not only for me but for my family, and I'm never going to let this happen again.

It's not anybody's fault but my own. I was weak when I shouldn't have been. I was guilty of doing what I was so utterly against not too long ago, and I just want to apologize to my country and this Court and my family, especially my daughters, and they're going to go a long time without a dad, but that's about all I can say, Your Honor. Thank you for the opportunity to say that.

(Sentencing Tr. p. 9, l. 18 - p. 10, l. 9).

The evidence against Mr. Fister was very strong. The risks to Mr. Fister in going to trial were very substantial. Mr. Fister does not challenge the finding of his guilt and still maintains that he is guilty.

Jasper Edmundson was the first witness called by Mr. Fister. Mr. Fister claims a conflict of interest by Mr. Edmundson because he claims to have information that Mr. Edmundson represented Mr. Kevin Waters and that representation was detrimental to Mr. Fister. Mr. Edmundson was asked, "[h]ad you at any point in time prior to your undertaking representation of Mr. Fister represented a young man named Kevin Waters?" He answered "[n]o" He said he had spoken to Mr. Waters briefly, at the Butler County Jail, learning he had been arrested for possession of methamphetamine and a small amount of marijuanna. This happened about three months before "Mr. Fister's events." Mr. Edmundson said he never saw Mr. Waters regarding that matter thereafter. He was asked if he received consideration for going to see Mr. Waters. He testified that Ms. Georgeanna Bazell had brought some collateral to his office the day before he went to the jail to visit Mr. Waters, but he returned the collateral to Ms. Bazell the next day. He had no knowledge that Michael Brookreson[1] representd Mr. Waters at or near that time. Mr.

---

[1] Mr. Brookreson has been a licensed attorney in Missouri since 1998. He formerly had represented Mr. Fister on some state criminal and municipal charges. In November or December 2002, Mr. Brookreson was called by Chief of Police of Poplar Bluff to appear at an interview of Kevin Waters at Mr. Waters' request. At the interview, Mr. Brookreson observed that there were officials in attendance who were not local officials. At the conclusion of the interview, Mr. Brookreson advised Mr. Waters to seek other counsel. He referred Kevin Waters to Mr. Edmundson for representation, because Mr. Brookreson did not represent clients in Federal

7

Brookreson was an associate in Mr. Edmundson's office from 1999 until May 2001. He never worked for Mr. Edmundson thereafter, but did occupy a space in the basement of Mr. Edmundson's office after Mr. Brookreson's office was flooded. Mr. Brookreson was never a partner in his firm.

Mr. Edmundson recalls visiting Mr. Waters at the Cape Girardeau County Jail one time. During that visit, Mr. Fister's name was not mentioned. He does not recall putting money on the books of Mr. Waters. When shown a document reflecting that Mr. Edmundson put $50.00 on the books of Mr. Waters at the Cape Girardeau County jail, Mr. Edmundson did not recall the event, but said if it occurred, he explained that it would have been the money of another person, and not his money. He said he might have left the money there while visiting Mr. Fister at the request of another person. He testified that the only information he took from Mr. Waters was his personal information and the charge Mr. Waters faced. He has not talked to Mr. Waters or anyone on behalf of Mr. Waters since that November 2002 meeting about any criminal matter Mr. Waters was facing.

Mr. Edmundson testified that he learned that Mr. Fister was having legal problems, "probably" in the paper. He has known Mr. Fister most of Mr. Fister's life. In the underlying criminal case from which this litigation arose, Mr. Fister was first represented by Jeffrey Rosenswank, federal public defender, then John Schneider. The pre-trial motion hearings, or waiver of those hearings occurred when Mr. Fister was represented by Mr. Schneider. The period for filing a motion to suppress before the Magistrate Judge had already passed when Mr.

---

Court. Mr. Brookreson does not know if Mr. Waters contacted Mr. Edmundson.

Edmundson began representing Mr. Fister, and a plea agreement[2] had already been prepared and submitted to Mr. Schneider before Mr. Edmundson began representing Mr. Fister. The range of punishment provided in that plea agreement was 168-210 months. Ms. Abbie Crites-Leoni, the Assistant United States Attorney, signed the plea agreement on July 24, 2003. Mr. Edmundson signed it on July 28, 2003. The plea agreement was in existence for more than a month before the plea of guilty was made by Mr. Fister. Mr. Edmundson testfied that Mr. Fister had access to the plea agreement during that month. He denies that he did anything to seek the representation of Mr. Fister and did not suggest to anyone that Mr. Fister should contact him. His first involvement in the case was with Mr. Fister's mother, Doris Ann Mortimer, whom he had known for "many, many years." She asked Mr. Edmundson to drop by the jail and visit her son about two weeks after he had been detained. His mother said Mr. Fister could not communicate with his counsel, Mr. Schneider, and Mr. Edmundson agreed to go to the Cape Girardeau Jail to visit with Mr. Fister. He told Mr. Fister that he would prefer that he hire someone other than himself who was not as close to the family. Mr. Edmundson recommended Curtis Poore, first to Ms. Mortimer. He had no expectation of representing Mr. Fister in the future. Mr. Edmundson had associated with Mr. Poore in eight or ten cases in the past. He believes that Mr. Poore, a former Assistant United States Attorney, is more familiar with federal procedure than anyone Mr. Edmundson knows, and Mr. Poore, he believes, is very familiar with the United States Sentencing Guidelines. Mr. Edmundson believed that there was a possibility that Mr. Fister might get his sentence

---

[2] Mr. John Schneider, counsel at the time for Mr Fister, hand-carried the first plea agreement to Mr. Fister when he was in the Cape Girardeau County Jail. Mr. Fister testified, in response to a question if Mr. Schneider reviewed the plea agreement with him, "[w]e started on it, and when he told me the time that was involved and the enhancements that the prosecutor was seeking, I - - he was ready - - he was wanting me to sign it and I refused to sign it." Mr. Fister discussed what was in the agreement with Mr. Schneider. Mr. Schneider left the plea agreement with Mr. Fister to read.

9

reduced under Fed.R.Crim.P. 35, and believed that Mr. Poore could be helpful in giving advice on that issue. Mr. Edmundson believes there was nothing detrimental to Mr. Fister because of any questions Mr. Edmundson asked of Mr. Poore at any time.

      Mr. Edmundson learned from Ms. Mortimer that Mr. Poore needed to withdraw from representing Mr. Fister because of a claimed conflict of interest of Mr. Poore. Mr. Edmundson confirmed with Mr. Poore that Mr. Poore would be withdrawing from representing Mr. Fister. At Ms. Mortimer's request, Mr. Edmundson went to see Mr. Fister, and the two agreed that Mr. Edmundson would represent Mr. Fister. Mr. Edmundson told Ms. Mortimer that he would prefer that Mr. Poore remain involved in the case primarily for technical advice and any possible post-conviction issues that might arise. Ms. Mortimer testified that Mr. Edmundson wanted to continue Mr. Poore's involvement in the case. In Mr. Poore's affidavit, he states, that after advising Mr. Fister that he could not represent him because of a conflict, Mr. Fister "asked me to be available to [Mr.] Edmundson if there were questions concerning the application of the sentencing guidelines or federal criminal procedure." Mr. Fister also testified that Mr. Edmundson recommended to him that Mr. Poore continue to be involved in the case. Mr. Edmundson made the agreement with Mr. Fister to represent him and the financial arrangements for the representation were made with Ms. Mortimer. Mr. Edmundson accepted a $25,000.00 retainer from Ms. Mortimer. He visited Mr. Fister on several occasions. Mr. Edmundson discussed with Mr. Fister Mr. Poore's conflict of interest. Because of the nature of the conflict of interest, Mr. Edmundson did not believe that had any effect on Mr. Fister's case. It never came to Mr. Edmundson's attention that Kevin Waters was a potential witness against Mr. Fister. There is no evidence that the conflict of interest of Mr. Poore was related in any way to Kevin Waters. Mr. Edmundson describes the nature of the conflict of interest of Mr. Poore as not really a

conflict, but a name appeared in a proffer and Ms. Crites-Leoni reminded Mr. Poore of that fact. Mr. Edmundson does not think Mr. Poore told him the name of the person who was the subject of the conflict of interest. Mr. Poore never advised Mr. Edmundson that he believed he had a conflict of interest in Mr. Fister's case. Ms. Crites-Leoni, who appeared at proffer interviews concerning Mr. Fister, never advised Mr. Edmundson that he had any conflict of interest in Mr. Fister's case.

Mr. Edmundson testified that he reviewed the plea agreement with Mr. Fister who made notations in the margin of the agreement; he wrote and asked questions about it to Mr. Edmundson. Mr. Fister wrote eight to ten letters to Mr. Edmundson when Mr. Fister was incarcerated before the sentencing hearing. At no time was any issue of a conflict of interest raised by Mr. Fister.

On the morning of Mr. Fister's plea of guilty, Mr. Edmundson was given a copy of the final copy of the plea agreement. Some "very minor changes," according to Mr. Edmundson, were made to the plea agreement. Mr. Edmundson denies telling Mr. Fister in the Marshal's Office before the plea of guilty was entered by Mr. Fister that if he did not enter a plea of guilty he would get a thirty year sentence. He denies ever telling that to anyone.

On cross-examination, Mr. Edmundson testified that he discussed the case with the Assistant United States Attorney, Abbie Crites-Leoni, and she told him that if the case went to trial, "she would expect that Mr. Fister might very likely receive a 30-year sentence." Mr. Edmundson acknowledged receipt of a letter from Ms. Crites-Leoni stating that if Mr. Fister did not accept the plea agreement that there would be a "nearly 30-year sentence."

Mr. Edmundson has been in criminal practice for over thirty-five years. He has Martindale-Hubbell's highest rating. He has appeared in seven or eight courts in different states. He has over three hundred open criminal files. There are five active lawyers in his firm.

Mr. Fister testified that when Mr. Poore appeared at the jail, he advised Mr. Fister that he had been paid, in full, for the representation. He told Mr. Fister that he would be meeting with the prosecutor to see what was going on, and would get back to him in about a week. In about a week, Mr. Poore returned and informed Mr. Fister that he had a conflict. He said that "Abbie" had told him he had a conflict; he would be withdrawing as Mr. Fister's counsel, and he asked Mr. Fister what he wanted to do with the money that had been paid to him by Ms. Mortimer. He said Mr. Poore recommended Jasper Edmundson, but Mr. Fister said he had some real concerns about Mr. Edmundson, but if Mr. Poore recommended him, Mr. Fister said to go ahead and forward the check to Mr. Edmundson.

Mr. Fister testified that when Mr. Edmundson presented the plea agreement to him on July 28, 2003, that he refused to sign it because he had never read it. He and Mr. Edmundson went back to the Marshals office to review the plea agreement. Mr. Fister testified that he read about half of it. Mr. Fister testified that he was asked in Court if he had read the plea agreement, and he said, under oath, that he had read it. Mr. Fister testified at the April 25, 2006 hearing that the statement he made under oath to this Court at the Change of Plea Hearing was not true. While under oath during the plea hearing, Mr. Fister testified that he told the judge he had an adequate opportunity to discuss the plea agreement with his attorney, but actually, he had not. He said that he and Mr. Edmundson discussed the plea agreement in the Marshals Office for four minutes; that Mr. Edmundson told him he was running out of time; if he didn't sign the plea agreement he would make Abbie Crites-Leoni mad; she was going to withdraw the offer; that Mr. Fister would

be getting thirty years and he could forget about any opportunity for a Rule 35 motion. Mr. Fister was reminded by his counsel at the April 25, 2006 hearing that he was sure Mr. Fister had been asked at the plea hearing if anyone had made any threats or promises to him, and Mr. Fister, at the plea hearing, had testified under oath that no one had. Mr. Fister's testimony at the April 25, 2006 hearing, also given under oath, is squarely opposed to his sworn testimony at the Change of Plea Hearing. Mr. Fister is not a believable witness. In denigration of his oath, Mr. Fister appears to be willing to say anything that he perceives to be beneficial to him, irrespective of the facts.

Mr. Fister wrote a series of letters to Mr. Edmundson while incarcerated. He wrote:

1. "I look forward to seeing you soon and I pray that you will take my case." (Gov't. Ex. D dated 4-28-03).
   "I really appreciate all that you are doing. I know you haven't got much to work with as I have really gotten myself into a 'pickle' of all 'pickles. I wanted to make sure you knew how thankful I am to have you on my defense. Also, that the visits and updates bring me much peace." (Gov't. Ex. E. dated 6-12-03).

2. "I am writing this letter to hopefully ease some of stress you have been under.
   First of all I believe I have the best representation that can be found anywhere. Further, I can tell that this whole ordeal has a very personal ring to it for you. That combination leaves me with a peace of mind that all that can be done will be done and is being done."
   * * *
   "Therefore, when this is all said and done and you put this file away, know that I am satisfied and believe in you and your ability. You can count this case as a victory. The true definition of Quality has and always will be the simple fact of 'Meeting Expectations.' That you have done by giving your best effort. For that I thank you and will always remain indebted to you. My prayers are with you and your family." (Gov't. Ex. F dated 7-27-03).

3. "As you know, never was I attempting to escape punishment - - I knew I was guilty and only because I felt my government manipulated events and quantities to ensure lengthy prison sentences was I hesitant to sign the plea." (Gov't. Ex. G dated 7-28-03).

    4.  I look forward to seeing you soon as sentencing day is a mere ten days off. Once again, thank you for the money order and more importantly, your representation of me during my darkest days." (Gov't Ex. H dated 10-16-03).

The day before Mr. Fister signed the plea agreement, he wrote Mr. Edmundson telling him that, "[f]irst of all, I believe I have the best representation that can be found anywhere."

### D I S C U S S I O N

Determination of the validity of a guilty plea rests on whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. *See Hill v. Lockhart,* 474 U.S. 52, 56 (1985). Where a defendant is represented by counsel during the plea process and enters his plea upon advice of counsel, voluntariness of the plea depends on whether counsel's advice was "within the range of competence demanded of attorneys in criminal cases.." *Id.* at 57 (citation omitted). To succeed on an ineffectiveness of counsel claim, Mr. Fister must show that Mr. Edmundson's performance was professionally unreasonable and that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668 (1984). To succeed, Mr. Fister must satisfy both of the *Strickland* prongs. If he fails to prove unreasonable performance, the prejudice prong need not be considered. If the prejudice prong is unsatidfied, the performance prong need not be considered. "Prejudice is presumed if a defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *See United States v. Flynn,* 87 F.3d 996, 1001 (8th Cir. 1996) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). A mere showing of prior representation of a prosecution witness by a trial lawyer does not entitle a defendant to relief. There must be a showing that successive representation had some actual and demonstrable adverse effect on the case, not merely an abstract or theoretical one. *Id.* Here, there is no

credible evidence that Mr. Edmundson had any conflict of interest in representing Mr. Fister, so there was neither successive or any other kind of representation of another client when Mr. Edmundson represented Mr. Fister, nor was there any demonstrable adverse effect on Mr. Fister's case by Mr. Edmundson's representation. Mr. Fister's 28 U.S.C § 2255 Motion concerns allegations of two instances of conflicts of interest. For reasons hereafter stated, the § 2255 Motion in its entirety will be dismissed.

As noted, Mr. Fister makes two claims of ineffective assistance of counsel arising from two claimed episodes of conflict of interest. The first claim is that Mr. Edmundson represented another client, Kevin Waters, at the same time Mr. Edmundson represented him, and that the representation concerned related cases, all without Mr. Fister's knowledge or consent. The second claim of conflict of interest arises from Mr. Edmundson's consultation with Curtis Poore, after Mr. Poore had withdrawn from representing Mr. Fister. Mr. Poore had previously notified Mr. Fister that after assuming his representation, Mr. Poore discovered a conflict of interest and was required to withdraw from the representation of Mr. Fister. The Court will consider the claims in order of reference.

Mr. Fister claims a violation by Mr. Edmundson of 4-1.7 of the Rules of Professional Conduct in representing him and Kevin Waters at the same time Mr. Edmundson represented him. That rule provides in relevant part:

> "(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless;
>
> > (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> > (2) each client consents after consultation."

15

That Rule has no application here. Mr. Edmundson solely represented Mr. Fister. There is no credible evidence that Mr. Edmundson represented Kevin Waters or anyone else that would create a conflict of interest that would call for the Rule's application. Mr. Fister fails in his proof in his attempt to put together a series of suppositions which lack any connection, in fact, to the representation by Mr. Edmundson of Kevin Waters or anyone that would create a conflict of interest in the representation of Mr. Fister. "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *See Cuyler v. Sullivan,* 446 U.S. 335, 350 (1980). Mr. Fister fails in his burden of proof to show the existence of any conflict of interest that adversely affected Mr. Edmundson's performance. "Until a defendant shows that her counsel 'actively represented conflicting interests, [she] has not established the constitutional predicate for [her] claim of ineffective assistance.'" (citation omitted). *See U.S. v. Acty,* 77 F.3d 1054, 1057 (8th Cir. 1996). The *Acty* case acknowledges in a footnote that under *Cuyler,* while the mere potential for a conflict of interest is insufficient to demonstrate a violation of a Sixth Amendment right, "[a] potential conflict of interest may, however, form the basis of an ineffective assistance of counsel claim under the two-pronged test of *Strickland v. Washington,* 466 U.S. 668 (1984)." (internal citations omitted). While the Court concludes there is neither actual or any potential for a conflict of interest on Mr. Fister's first claim of ineffective assistance of counsel against Mr. Edmundson, because he did not represent Kevin Waters at the same time he represented Mr. Fister, an anayysis under *Strickland* reveals that Mr. Fister's claim fails. To prevail under *Strickland,* Mr. Fister must prove that 1) Mr. Edmundson had a potential conflict of interest and 2) the potential conflict prejudiced his defense. There is no credible evidence supporting either element. Mr. Fister's

claim of ineffective assistance of counsel based on a conflict of interest in Mr. Edmundson representing Mr. Fister and Kevin Waters at the same time in related cases is denied.

Concerning Mr. Fister's second claim of ineffectiveness of counsel because of conflict of interest, there is no dispute that Curtis Poore was retained to represent Mr. Fister in the underlying criminal case, *United States of America v. Peter Daniel Fister,* cause no. 1:03CR00030 ERW. Money for a retainer was supplied by Mr. Fister's step-father and mother to Mr. Poore. Shortly after assuming the representation of Mr. Fister, Mr. Poore learned from a conversation with Abbie Crites-Leoni, Assistant United States Attorney, that he "had a conflict with representing Fister because of my representation of another individual in a separate federal criminal case." (Affidavit of Mr. Poore dated 12-23-04; Govt. Ex. 3). Mr. Poore withdrew from the further representation of Mr. Fister. According to Mr. Poore's affidavit, he

> met with Fister and explained to him that I had a conflict. I recommended to Fister that Edmundson represent him. Fister asked me to be available to Edmundson if there were questions concerning the application of the sentencing guidelines or federal criminal procedure. I told Fister I would be glad to do so but emphasized to him that I could not represent him. Fister indicated his approval and appreciation.

Thereafter, Mr. Edmundson was retained to represent Mr. Fister. Mr. Edmundson and Mr. Poore did consult about application of United States Sentencing Guidelines to Mr. Fister's case. In his affidavit, Mr. Poore explains that he told Mr. Fister's mother, Ann Mortimer "that [he] would be available to Edmundson concerning any questions about federal criminal procedure or the application of the U.S. Sentencing Guidelines. Ann Mortimer indicated her approval and appreciation." There is absolutely no evidence that Mr. Edmundson and Mr. Poore ever discussed any other person connected to Mr. Fister or his case. Mr. Fister not only consented to Mr. Edmundson consulting with Mr. Poore, but he specifically requested that the consultation occur. There is absolutely no proof that any information of any kind was exchanged between Mr.

17

Edmundson and Mr. Poore which was adverse to Mr. Fister in any way. More importantly, considering all of the facts in this case, even Mr. Fister does not speculate how the known conflict of interest of Mr. Poore was adverse to Mr. Fister.

Mr. Fister fails to prove that an actual conflict of interest adversely affected Mr. Edmundson's performance. There is no showing by Mr. Fister that Mr. Edmundson actively represented conflicting interests. *Cuyler* at 1057. Under the *Strickland* analysis, there is no evidence that any consultation with Mr. Poore prejudiced Mr. Fister's defense. Mr. Fister's claim of conflict of interest because Mr. Edmundson consulted with Mr. Poore after Mr. Poore withdrew from representing him is denied.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner, Peter Daniel Fister's Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [doc. #11] as to Ground One is dismissed with prejudice. The Court has already dismissed all other remaining grounds of Petitioner's Motion.

**IT IS FURTHER ORDERED** that the Court shall not issue a certificate of appealability as to Ground One. The Court has already ordered that no certificate of appealability issue as to all other Grounds.

Dated this 16th day of October, 2006.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE